**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**IRONWORKERS LOCAL UNION NO. 808, IRONWORKERS LOCAL UNION NO. 808 PENSION FUND, IRONWORKERS LOCAL UNION NO. 808 ANNUITY FUND, IRONWORKERS LOCAL UNION NO. 808 APPRENTICESHIP FUND, WADE A. IVEY, GREGORY HOLMES, BEN SCHMITT, WES KENDRICK, MICHAEL HALE, PAUL METTE and SOUTHEASTERN IRON WORKERS WELFARE FUND,**

**Case No.: 6:12-cv-1187-Orl-22KRS**

**Plaintiffs,**

**v.**

**CHAMPION STEEL OF CENTRAL FLORIDA, INC.,**

**Defendants.**

_______________________________________/

**DECLARATION OF WES KENDRICK**

I declare under penalty of perjury that the foregoing is true and correct:

1. Since 2003, I have been the business manager of Ironworkers Local 808. My office is located at 200 East Landstreet, Orlando, Florida. My duties include negotiating and administering collective bargaining agreements with area contractors. I am also one of the Trustees of the Ironworkers Local 808 pension, annuity and apprenticeship funds. The following information is based upon my personal knowledge.

2. On or about August 3, 2005, Ellison Marsil, on behalf of Champion Steel Corporation signed a letter agreeing to become bound by the provisions of the collective bargaining agreement made and entered into between Local 808 and the Mid Florida Steel Erectors

Association.  A copy of the letter is attached hereto as Exhibit "A."

    3. Marsil mistakenly signed a form referring to the 2001-2004 collective bargaining agreement when, in fact, Local 808 and  the Mid Florida Steel Erectors had already entered into a bargaining agreement for years July 1, 2004 through June 30, 2006.  Article 20.1 of the 2004 to 2006 collective bargaining agreement, and all subsequent collective bargaining agreements, required that a contractor provide notice more than 120 days prior to expiration of the agreement that it desired to terminate or change the current contract or else the agreement would continue to remain in effect.  Champion Steel never provided to Local 808 a notice terminating the agreement.  After expiration of the 2004 to 2006 CBA, Local 808 and the Mid Florida Erectors entered into a successor CBA covering the years 2006 through 2009, and then a collective bargaining agreement effective from July 1, 2007 through June 30, 2010, which was later extended through June 30, 2012.  A true and accurate copy of the 2007 through 2010 agreement is attached hereto as Exhibit "B."  Article 20.1 of the 2007 through 2010 agreement also provided that employers were required to provide notice more than 20 days prior to expiration of the agreement that the contractor desired to terminate or change the current contract or else it would remain in effect.

    4. After Marsil signed the assent form, Local 808 began referring its members to Champion Steel.  Local 808 continued to do so until Champion Steel went out of business in 2012.  Champion Steel obtained all of its ironworkers from Local 808, and paid them pursuant to the terms of the collective bargaining agreement.

    5. Pursuant to the 2007 to 2010 collective bargaining agreement, as well as the preceding agreements, Champion was required to contribute money to the pension, annuity, apprenticeship, and other funds, and the Southeast Ironworkers Health Care Plan for every hour worked by a

Local 808 member referred to an employer.

6. By the terms of the CBA, Champion was also required to send a reporting form to the funds along with its contribution. Each reporting form contains the statement:

> Because of the difficulty in obtaining signed agreements, the undersigned employer, by signing this form, acknowledges that he is bound to all terms and provisions of the current collective bargaining agreement in existence.

7. Attached to the declaration of the Third Party Administrator are reporting forms for the several months in 2011 and 2012. The above quoted language appears above the signature of Lynn Henry, whom I personally knew to be the office manager of Champion Steel.

8. After Champion stopped making contributions in 2011, the Trustees attempted to audit their records. Attached as Exhibit "D" is a true and correct copy of an August 17, 2012 letter from fund counsel demanding an audit. However, Champion would not make available its books and records.

Wes Kendrick

Wes Kendrick

dated: May 29, 2013

5-3-10 ATT: Toe Lew

407-422-3858

GREATER ORLANDO AREA AND VICINITY IRON WORKERS AGREEMENT
LOCAL 808, ORLANDO, FLORIDA
Of The
INTERNATIONAL ASSOCIATION OF BRIDGE
STRUCTURAL, ORNAMENTAL AND REINFORCING IRON WORKERS

Henry W. Kendrick
Business Manager

200 E. Landstreet Road
Orlando, Fl 32824
407-859-9366

This will acknowledge that the undersigned, acting for and on behalf of

CHAMPION STEEL CORPORATION

hereby accepts, adopts and agrees to be bound by each and every term and provision, including those which create and require contributions to Health and Welfare, Pension, Vacation, and Apprenticeship Funds, for the benefit of Employees and their dependents, and to the Institute of the IRONWORKING Industry, Political Action Fund, Dues Check-off (to include weekly Dobie), District Council, and Contract Management Fund, all contained in that certain Collective Bargaining Agreement made and entered into on July 1, 2001, at Orlando, Orange County, Florida, of the International Association of Bridge, Structural, Ornamental, and Reinforcing Iron Workers and the Mid Florida Steel Erectors Association, Inc.

By the execution of this undertaking, the undersigned expressly acknowledges that he has received and examined a true and exact copy of the aforementioned Collective Bargaining Agreement. In addition the undersigned Employer adopts and accepts as his representatives in the administration of the aforementioned Healthcare, Pension, Annuity, Vacation, Substance Abuse, United Way and Apprenticeship Funds those trustees appointed by MFSEAI who are acting as employer trustees and Administered.

The aforementioned Collective Bargaining Agreement, as amended, shall be in full force and effect until June 30, 2004.

Accepted for Company

Ellison Marsil
(please Print Name)

[signature]
(Authorized Signature of Employer)

P.O. Box 4045 - Billing
1790 Turtle Hill Rd
Enterprise FL 32725
Local Address

Ph: 407-323-9819
Fx: 407-302-0189
Local Phone Number and Fax Number

Worker's Comp. Insurance Carrier
National Union Fire
ACE American Insurance Co.
Seabert Associated, Inc.
(561) 799-3330

Accepted for Local 808

Henry W. Kendrick, Business Mgr.

Date

Copies: Employer

Mid Florida Steel Erectors

1.8

EXHIBIT A
ALL-STATE LEGAL

# GREATER ORLANDO AREA AND VICINITY IRON WORKERS AGREEMENT

Between

## IRON WORKERS LOCAL 808

Of The

## INTERNATIONAL ASSOCIATION OF BRIDGE, STRUCTURAL, ORNAMENTAL, AND REINFORCING IRON WORKERS

And

## MID FLORIDA STEEL ERECTORS ASSOCIATION, INC.

July 1, 2007 through June 30, 2010

**extended thru June 30, 2012**

EXHIBIT
B

**TABLE OF CONTENTS**

ARTICLE 1 RECOGNITION ---- 1
1.1.1 – PREAMBLE ---- 1
1.2 – EMPLOYER REPRESENTATIVE ---- 1
1.2.2 – TERMINATION OF EMPLOYER REPRESENTATIVE ---- 1
1.3 – BREACH OF AGREEMENT ---- 2
1.4 – EMPLOYEES NOT COVERED ---- 2
1.5 – WORK NOT COVERED ---- 2
ARTICLE 2 MANAGEMENT FUNCTIONS AND PREROGATIVES ---- 2
2.1 - ---- 2
ARTICLE 3 – GENERAL WORKING RULES ---- 2
3.1 – JURISDICTION OF WORK ---- 2
3.1.1 – GEOGRAPHIC JURISDICTION ---- 2
3.2 – EMPLOYMENT OF IRON WORKERS ---- 2
3.3 – HOURS OF WORK ---- 2
3.4 – WORK WEEK, EMPLOYER'S OPTION ---- 3
3.4.1 - ---- 3
3.4.1.1 – FIVE EIGHTS: ---- 3
3.4.1.1.1 – MAKEUP HOURS, FIVE EIGHTS ---- 3
3.4.1.2 – FOUR TENS 4.1.2 – FOUR TENS: ---- 3
3.4.1.2.1 – MAKEUP DAY, FOUR TENS: ---- 3
3.4.1.2.2 – MAKEUP DAY SCHEDULE ---- 3
3.5 – EMPLOYEE'S WORK POST ---- 3
3.6 – SHIFT WORK ---- 3
3.6.1 – EIGHT HOUR SHIFTS ---- 3
3.6.2 – TEN HOURS SHIFTS ---- 3
3.7 – COFFEE BREAKS ---- 3
3.8 – OVERTIME ---- 4
3.9 – HOLIDAYS ---- 4
3.9.1 -: ---- 4
3.10 – REPORTING FOR WORK ---- 4
3.11 – TOOLS AND EQUIPMENT ---- 4
3.11.1 – ORNAMENTAL IRONWORK ---- 4
3.11.2 – ROD WORK ---- 4
3.11.3 – EMPLOYER SUPPLIED TOOLS & EQUIPMENT ---- 4
3.11.3.1 - ---- 4
3.11.4 – TOOLS & EQUIPMENT NOT EMPLOYER FURNISHED ---- 4
3.12 – DRINKING WATER ---- 4
3.13 – FOREMAN ---- 4
3.14 – GENERAL FOREMAN ---- 4
3.15 – PAY DAY ---- 5
3.16 – CHECKING IN AND OUT ---- 5
3.17 – WAGE RATES AND FRINGE BENEFITS ---- 5
3.17.1 – ANNUITY FUND ---- 5
3.18 – UNION CHECK – OFF ---- 5
3.18.1 – DISTRICT COUNCIL DUES and ASSESSMENTS ---- 6
3.18.2 – IRON WORKERS POLITICAL ACTION LEAGUE CHECKOFF ..... 6
3.18.3 – LIMITATION OF EMPLOYER'S RESPONSIBILITY ---- 6
3.19 – APPRENTICES ---- 6
3.19.1 – APPRENTICE RATIO ---- 6
3.19.2 – TERM OF APPRENTICESHIP ---- 6
3.19.4 – FRINGE AND OTHER CONTRIBUTIONS ---- 6
ARTICLE 4 – JURISDICTIONAL DISPUTES ---- 6
4.1 -: ---- 6
4.1.1 - ---- 6
4.1.2 - ---- 6

ARTICLE 5 – STRIKES AND LOCKOUTS ---------- 7
5.1 - ---------- 7
ARTICLE 6 – GRIEVANCE PROCEDURE ---------- 7
6.1 - ---------- 7
6.2 - ---------- 7
6.3 - ---------- 7
6.4 - ---------- 7
6.5 - ---------- 7
6.6 - ---------- 7
6.7 - ---------- 8
ARTICLE 7 – JOINT LABOR/MANAGEMENT COMMITTEE ---------- 8
7.1 - ---------- 8
7.2 - ---------- 8
7.3 - ---------- 8
7.4 - ---------- 8
7.5 - ---------- 8
ARTICLE 8 – STEWARDS ---------- 8
8.1 - ---------- 8
8.2 - ---------- 9
8.3 - ---------- 9
ARTICLE 9 – GENERAL CONDITIONS ---------- 9
9.1 – WORK LIMITATIONS ---------- 9
9.2 – DOUBLE JOBS ---------- 9
9.3 – WORKERS' COMPENSATION INSURANCE ---------- 9
9.4 – OSHA ---------- 9
ARTICLE 10 – BUSINESS REPRESENTATIVE ON JOB ---------- 9
10.1 - ---------- 9
ARTICLE 11 – MAINTENANCE OF STANDARDS ---------- 9
11.1 - ---------- 9
ARTICLE 12 – SUBSTANCE ABUSE PROGRAM ---------- 9
12.1 - ---------- 9
12.2 - ---------- 9
12.3 - ---------- 10
12.4 - ---------- 10
ARTICLE 13 – SAFETY ---------- 10
13.1 - ---------- 10
13.2 - ---------- 10
ARTICLE 14 – HEALTHCARE, PENSION, APPRENTICESHIP, AND ALL OTHER FUNDS ---------- 10
14.1 – FUNDS ESTABLISHED ---------- 10
14.1.1 – RATIFICATION OF TRUSTS ---------- 10
14.1.2 – TRUST DOCUMENTS ---------- 10
14.1.3 – TERMINATION OF FUNDS ---------- 10
14.1.3.1 - ---------- 10
14.1.4 – MUTUALITY OF TRUSTS AND AGREEMENT ---------- 10
14.1.5 – JOINTLY ADMINISTERED ---------- 10
14.1.6 – TRUSTEE APPOINTMENT ---------- 10
14.2 – SOUTHEASTERN IRONWORKERS HEALTHCARE FUND ---------- 10
14.2.1 – "A" PLAN ---------- 10
14.3 – IRONWORKERS LOCAL UNION 808 PENSION FUND ---------- 11
14.3.1 – ---------- 11
14.3.2 - ---------- 11
14.4 – IRON WORKERS INDUSTRY OF MID FLORIDA JOINT APPRENTICESHIP PROGRAM FUND ---------- 11
14.4.1 – APPRENTICESHIP CONTRIBUTION ---------- 11
14.4.2 – JOURNEYMAN UPGRADE FUND CONTRIBUTION ---------- 11
14.4.3 - ---------- 11
14.4.4 - ---------- 11
14.5 – NATIONAL APPRENTICE TRAINING FUND (**I.M.P.A.C.T.**) ---------- 11

14.6 – IRON WORKERS POLITICAL ACTION LEAGUED CHECK OFF ---- 11
14.7 – ANNUITY FUND ---- 11
14.7.1 - ---- 11
14.7.2 - ---- 11
14.8 – IRONWORKERS CHARITY CHECK-OFF ---- 11
14.9 – SUBSTANCE ABUSE PROGRAM ---- 11
14.10 – INSTITUTE OF THE IRONWORKING INDUSTRY(I.M.P.A.C.T.) ---- 11
14.11 – CONTRACT MANAGEMENT FUND ---- 12
14.11.1 - ---- 12
14.11.2 - ---- 12
14.12 – DISTRICT COUNCIL CHECK OFF ---- 12
14.13 – ORGANIZING FUND CHECK OFF ---- 12
14.14 – FUNDS PROTECTION ---- 12
14.14.1 – TEN SEPARATE FUNDS ---- 12
14.14.2 – FOUR SEPARATE FUNDS ---- 12
14.14.3 – CONTRIBUTIONS ---- 12
14.14.3.1 – ANNUITY CONTRIBUTIONS ---- 13
14.14.4 – OTHER CONTRIBUTIONS ---- 13
14.14.5 – ALLOCATION OF CONTRIBUTIONS ---- 13
14.14.6 – BONDING ---- 13
14.14.7 – OBLIGATION TO PAY CONTRIBUTIONS ---- 13
14.14.8 – AGGREGATE CONTRIBUTIONS ---- 14
14.14.9 – WEEKLY CONTRIBUTIONS ---- 14
14.14.10 – NON-PAYMENT AND/OR DELINQUENCY in the payment of any one or more of these funds shall constitute a breach of the Agreement ---- 14
14.14.11 – COST OF COLLECTION ---- 14
14.14.11.1 - ---- 14
14.14.11.2 - ---- 14
14.14.12 – COST AF AUDITING ---- 14
14.14.13 – PRODUCTION OF RECORDS ---- 15
14.14.14 – EMPLOYER FURNISHED INFORMATION ---- 15
14.14.15 – UNION FURNISHED INFORMATION ---- 15
14.14.16 – EQUALIZATION OF CONTRIBUTIONS ---- 15
ARTICLE 15 – CALL BY NAME ---- 15
15.1 - ---- 15
ARTICLE 16 – REFERRAL OF EMPLOYEE APPLICANTS ---- 15
16.1.1 – HIRING HALL AGREEMENT ---- 15
16.2 – EMPLOYER'S RIGHT TO EMPLOY ---- 15
16.3 – EMPLOYER'S RIGHT TO TRANSFER EMPLOYEES ---- 15
16.4 – OTHER EMPLOYEES ---- 16
16.5 – EMPLOYER RIGHT TO REJECT ---- 16
16.6 – 24 HOUR REQUIREMENT ---- 16
16.7 – APPRENTICES ---- 16
16.8 – EQUAL EMPLOYMENT OPPORTUNITY ---- 16
ARTICLE 17 – PARTS SIGNATORY ---- 16
17.1 - ---- 16
17.2 - ---- 16
17.3 - ---- 16
ARTICLE 18- SAVINGS CLAUSE ---- 16
18.1 - ---- 16
ARTICLE 19 – SCOPE OF AGREEMENT ---- 17
19.1 - ---- 17
ARTICLE 20 – DURATION ---- 17
20.1 – NOTICE REQUIREMENTS ---- 17
20.2 – AGREEMENT RE-OPENER ---- 17
20.3 – OBLIGATION TO NEGOTIATE ---- 17

# GREATER ORLANDO AREA AND VICINITY AGREEMENT

Effective July 1, 2007, through June 30, 2010

THIS AGREEMENT, made and entered into this first day of July, 2007 at Orlando, Orange County, Florida, by and between:

IRON WORKERS LOCAL UNION 808, ORLANDO, FLORIDA
Of The
INTERNATIONAL ASSOCIATION OF BRIDGE,
STRUCTURAL, ORNAMENTAL, AND REINFORCING IRON WORKERS
And
MID FLORIDA STEEL ERECTORS ASSOCIATION, INC.

## ARTICLE 1- RECOGNITION

**1.1.1- PREABLE:** This Agreement is made and entered into as of July 1,2007, by and between the MID FLORIDA STEEL ERECTORS ASSOCIATION, INC., hereinafter referred to as the MFSEAI, and LOCAL UNION 808 of the INTERNATIONAL ASSOCIATION OF BRIDGE, STRUCTURAL, ORNAMENTAL, AND REINFORCING IRON WORKERS (affiliated with the AFL-CIO), hereinafter referred to as the UNION. The use of the terms EMPLOYER, CONTRACTOR, SUBCONTRACTOR, EMPLOYEE, IRON WORKER, or UNION in this Agreement shall be construed according to the sense intended or as the context requires.

**1.1.2-** This Agreement is entered into by collective bargaining to prevent strikes and lockouts and to facilitate peaceful adjustment of grievances and disputes between the Employer and the Union in this trade, and to prevent waste , unnecessary, and unavoidable delays and expense, and so far as possible, to provide for labor, continuous employment in accordance with the conditions herein set forth and at wages herein agreed upon; also, that stable conditions may prevail in the building construction industry and building construction costs may be as low as possible, consistent with fair wages and conditions, and further the establishment of the necessary procedures by which those ends may be accomplished.

**1.2- EMPLOYER REPRESENTATIVE:** Mid Florida Steel Erectors Association, Inc., signatory to this Agreement, is the duly authorized and recognized bargaining representative of the Employers employing Iron Workers within the territorial jurisdiction of this Agreement, whether contracting or subcontracting.

Each Employer signatory to this Agreement, or otherwise bound by this Agreement, designates and acknowledges Mid Florida Steel Erectors Association, Inc., as its exclusive representative for this Collective Bargaining Agreement, and all matters covered and otherwise contained herein; including, but not limited to, all mandatory and discretionary subjects of collective bargaining, as the context applies, including, but not limited to, wages, hours, and working conditions and shall remain said Employer's exclusive agent for such purposes both during the term of this Agreement and any modifications thereof and following the termination of the Agreement for and during the negotiations and during the term of each succeeding Collective Bargaining Agreement and modification thereof.

**1.2.2-TERMINATION OF EMPLOYER REPRESENTATIVE:** Any Employer signatory to this Agreement, or otherwise bound by this Agreement, acknowledges that it may give both the Union and Mid Florida Steel Erectors Association, Inc., written notice not less than 120 days prior to the termination date of this Collective Bargaining Agreement, or not less than 120 days prior to the termination of any subsequent renewal, modification, or extension hereof, of said Employer's intention to no longer be bound by Mid Florida Steel Erectors Association, Inc., as its Collective Bargaining representative and, failing to give said notice, it agrees to be bound by each subsequent renewal, modification, or extension of this Collective Bargaining Agreement until and unless timely notice as aforesaid is given prior to the termination of said Collective Bargaining Agreement or prior to the termination of any subsequent renewal, modification, or extension hereto. If no notice is given as aforesaid, all subsequent Collective Bargaining Agreements negotiated between Mid Florida Steel Erectors Association, Inc., and Local Union 808 shall be deemed to have been negotiated on behalf of the Employer and shall be executed by the Employer upon request of the Union.

**1.3-BREACH OF AGREEMENT:** Failure of the Employer to comply with the application or provisions of the Healthcare Program, Apprenticeship and Training Trust Fund, Local Union Dues Check off, District Council Dues Check off including, but not limited to the Contract Management Fund, IPAL, Annuity, Substance Abuse, and Pension Fund, as well as their collection, audit, bonding, and other policies or procedures adopted by the Board of Trustees, all of which are incorporated herein, shall constitute a breach of this Agreement insofar as the Employer is concerned.

**1.4-EMPLOYEES NOT COVERED:** This Agreement does not apply to general superintendents, superintendents, assistant superintendents, office and clerical employees, watchmen, professional, or supervisory employees as defined in the National Labor Relations Act, as amended.

**1.5-WORK NOT COVERED:** This Agreement does not include, but not by way of limitation, the type of work generally performed under Project Agreements, General Presidents' and Disney Agreement.

## ARTICLE 2- MANAGEMENT FUNCTIONS AND PREROGATIVES

**2.1-** The Union and the employees recognize that the Employer has the exclusive right to manage and direct its business. Accordingly, the Employer specifically, but not by way of limitation, reserves the exclusive right to: hire the employees from the Union subject to the guidelines in the Referral Clause of this Agreement; discharge the Employees at the sole discretion of the Employer; promote and/ or demote the employees{provided a Union certified Journeyman my not be demoted to the status of an apprentice}; transfer employees from location to location from time to time; lay off and rehire employees pursuant to the Referral Clause in the Agreement; determine the starting and quitting times and the number of hours and shifts to be worked subject to the guidelines of the General Working Rules; maintain the efficiency of employees by communication through supervisory personnel; merge, consolidate, sell, expand, close down the Employer's business or any part thereof, or expand, reduce, alter, combine, assign, or cease any job; control the use of machinery, equipment, and other property of the Employer; determine the number, location, and operation of plants, divisions, and departments thereof; the products to be fabricated, handled, erected, and installed; the schedules of production, the assignment of work to the employees, and the size and composition of the work force of the employees subject to the current General Working Rules; make or change company policies and practices; introduce new or improved production, maintenance, services, and distribution methods, materials, machinery, and equipment; manage the Employer's business, jobs, jobsites; and direct the work force through the Employer's selected foreman. If the Employer fails to exercise any one or more of the above functions from time to time, it shall not be deemed a waiver of the Employer's right to exercise the same.

## ARTICLE 3- GENERAL WORKING RULES

**3.1-JURISDICTION OF WORK** It is agreed that this Agreement covers all field erection and construction work traditionally performed by and coming under the jurisdiction of the International Association of Bridge, Structural, Ornamental, and Reinforcing Iron Workers. The Employer recognizes that the claimed scope of work covered under this Agreement by the International Association is that recognized within the charter grant issued by the AFL to the International Association of Bridge, Structural, Ornamental and Reinforcing Iron Workers, and Contained in Article 4 of the International Association's Constitution and the Collective Bargaining Agreement. The Union agrees to perform any work assigned to the Union by the Employer and which the Employees covered hereunder are qualified to perform.

**3.1.1-GEOGRAPHIC JURISDICTION:** The geographic jurisdiction of this Agreement shall include the entire counties of Brevard, Lake, Marion, Osceola, Orange, Seminole, Sumter, and Volusia.

**3.2-EMPLOYEMENT OF IRON WORKERS:** The conditions covering employment of journeymen and apprentice iron workers shall be as hereafter set forth, except as may be modified by the Joint Labor/Management Committee, in which case, said modification shall be incorporated herein by reference as though fully and at length set forth herein.

**3.3-HOURS OF WORK:** The work week, except as otherwise specified in this Agreement, shall start at 7:00 a.m. Monday and conclude the following Monday at 7:00 a.m. Eight hours shall constitute a standard work day between 7:00 a.m. and 5:00 p.m. with an unpaid one-half hour period designated for lunch. These working hours may be changed by mutual consent of the Employer and the Union. Employees shall be at their post for a full eight{8} hours each day. Forty{40} hours per week shall constitute a regular week's work. The designated ½ hour un-paid lunch period shall be scheduled at the mid-point of the scheduled work shift. Lunch period may be curtailed by agreement with the Employees on the job and the Employer or his representative

**3.4-WORK WEEK, EMPLOER'S OPTION:** The Employer has the option of working either five{5} eight-hour days or four{4} ten-hour days to constitute a normal forty{40} hour work week, provided it does not conflict with federal or state laws or local regulations.

**3.4.1-** The Employer can change from one such schedule to the other, subject to the limitation that it will give The Local Union at least two{2} work days' notice of such change.

**3.4.1.1-FIVE EIGHTS:** When the five{5} day, eight{8} hour week is in effect, forty{40} hours per week shall constitute a week's work, Monday through Friday, inclusive.

**3.4.1.1.1-MAKE UP HOURS, FIVE EIGHTS:** There is no Saturday make up day. In the event of lost time because of inclement weather or other conditions, the Employer, at his option, can make up lost time, or anticipated lost time, at the straight time rate. Monday through Friday. On any lost time, or anticipated lost time make up, no work day shall exceed ten{10} hours at the straight time rate. The Employer cannot make up a holiday but can at his option, make up any other lost time during a work week in which a holiday falls to complete thirty-two{32} hours at the straight time rate.

**3.4.1.2-FOUR TENS .4.1.2-FOUR TENS:** When the four{4} day ten{10} hour work week is in effect, the standard work day shall be an established consecutive ten{10} hour period between the hours of 6:30a.m. and 6:30 p.m. exclusive of the thirty{30} minute unpaid lunch period. Forty {40} hours per week shall constitute a week's work, Monday through Thursday, inclusive.

**3.4.1.2.1-MAKE UP DAY, At FOUR TENS:** In the event the job is down for any reason beyond the Employer's control, then Friday may at the option of the Employer, be worked as a makeup day; straight time not to exceed forty{40} hours per week. The Employer can not make up a holiday but can, at his option, make up any other lost time during a work week in which a holiday falls to complete thirty{30} hours at straight time rate. Starting time will be designated by the Employer; and the Union will be advised of the starting time. In all cases, the work week and pay week will start with the first shift on Monday.

**3.4.1.2.2. – MAKEUP DAY SCHEDULE**: When the Employer is utilizing a makeup day, Employees will work the normal work day of ten (10) hours. If an Employee is making up less than ten (10) hours, the hours worked, over those to be made up, will be paid at time and one-half rate.

3.5 - **EMPLOYEE'S WORK POST**: The Employees shall be at their posts, as determined by the Employer, prepared to start work at the regular starting time. No Employee shall leave the jobsite until designated by the Employer's representative. This provision will not preclude the Employer's right to: (a) terminate said employment prior to quitting time; (b) direct the Employee to another of the Employer's jobsites and/or (c) request the Local Union's official representative to meet for a pre-job conference to mutually alter the hours of the regular work day.

**3.6- SHIFT WORK**: When so elected by the Employer, the multiples shifts may be worked.

**3.6.1 – EIGHT HOUR SHIFTS**: The first shift shall work eight (8) hours at the regular straight time rate. The second shift shall work seven and one-half (7-1/2) hours and receive eight (8) hours pay,. The third shift shall work seven (7) hours and receive eight (8) hours pay. A thirty (30) minute unpaid lunch period for each shift shall be designated at a mutually agreed upon time of day by the Employer and the Union representative.

**3.6.2- TEN HOUR SHIFTS**: When a four (4) day week is being utilized and two (2) shifts are scheduled, the first "day" shift will consist of ten (10) hours of work with a one-half hour unpaid lunch period and the second shift will consist of nine and one-half (9-1/2) hours of work with a one-half hour unpaid lunch period. Employees will receive ten (10) hours of pay at each Employee's straight time hourly rate if the entire shift is worked and each shift worked will be considered ten (10) hours worked for the purpose of computing overtime pay.

**3.7 – 3.7 – COFFEE BREAKS**: There shall be a designated 15 minute "break" during the morning shift. Breaks will be taken at the work point.

**3.8 – OVERTIME**: An Employee shall be paid one and one-half times the regular rate of pay for hours worked in excess of forty (40) hours per week, any work performed on Monday through Friday in excess of ten (10) hours per day, and for all hours worked on Saturday. Sunday and Holiday's are to be paid at double time rate.

**3.9 – HOLIDAYS**: The following seven (7) holidays shall be observed:

1. New Year's Day
2. Memorial Day
3. Independence Day
4. Labor Day
5. Thanksgiving Day
6. Day after Thanksgiving Day
7. Christmas Day

SATURDAY & SUNDAY: Holidays that fall on Saturday shall be observed on the preceding Friday, and Holidays that fall on Sunday shall be observed on the following Monday. No work shall be performed on Labor Day except to save life or property.

**3.9.1 - :** Notwithstanding anything contained in the Agreement to the contrary, holidays recognized herein are unpaid holidays unless otherwise requested by the Employer.

**3.10 – REPORTING FOR WORK**: When an Employee is ordered by the Employer or his representative to report, for work and then, through no fault of such Employee, is not put to work or employed for less than two (2) hours, the Employer shall pay the Employee for two (2) hours' time, provided such Employee remains on the job during said Two (2) hours. On jobs of more than two (2) hours' duration, all iron workers shall be paid for the actual hours Worked.

**3.11 – TOOLS AND EQUIPMENT**: All Employees shall furnish all hand tools necessary for them to properly commence and accomplish their assigned work, except for power tools, drill bits, and hacksaw blades. Each Employee shall furnish his own hard hat, safety shoes, welding hoods, and welding goggles.

**3.11.1 – ORNAMENTAL IRONWORK**: An Employee, employed on ornamental work, shall furnish for his own use all hand tools to enable him to effectively install such work..Tools broken on the job such as drills, bits, taps, hacksaw blades, etc. shall be replaced by the Employer.

**3.11.2 – ROD WORK**: Employees are required to furnish a pair of pliers, tapes or rules not less than six (6) feet nor more than sixteen (16) feet long when starting to work, and reels.

**3.11.3–EMPLOYER SUPPLIED TOOLS & EQUPMENT**: The Employer will supply welding gloves, leathers, Burning goggles and Welding Hood replacement lenses, and any special equipment, if needed, all bolt cutters, bending bars, hickeys, hacksaw frames and blades, as well as all other tools needed for the fabrication and erection of reinforcing steel materials.

**3.11.3.1 - :** Employees will sign a receipt for all equipment and tools issued by the Employer and will be accountable for the same while in their custody until returned to the Employer during the regular course of their employment.

**3.11.4 – TOOLS & EQUIPMENT NOT EMPLOYEE FURNISHED:** No Employee shall be permitted to furnish, supply, loan, or rent to a Employer any equipment used in connection with Iron Workers' work, such as welding, machines, cutting torches, impact wrenches, power grinders, power drills, pickup trucks, hoisting equipment, or other, similar equipment in a category recognizably larger than conventional hand tools covered in this Article.

**3.12. DRINKING WATER:** The Employer shall furnish suitable drinking water and disposable paper cups if necessary.

**3.13 – FOREMAN:** Where two (2) or more Iron Workers are employed, one (1) shall be selected by the Employer to act as foreman and receive a foreman's wage, and the foreman is the only representative of the Employer who shall issue instructions to the workers.

**3.14 – GENERAL FOREMAN:** General Foreman may be employed at the sole discretion of the Employer. When a general foreman is employed, he shall supervise foreman only.

## WAGE RATES AND OTHER REMUNERATION

**3.15 – PAY DAY:** Payment of wages shall be weekly and during working hours, normally on Fridays but, in any event, not later than five (5) working days after the close of the payroll period, and shall be in currency or company check on a bank within the jurisdictional territory of the Union, provided the Employer is a member of MFSEAI. Employers who are not members of MFSEAI, who wish to use company checks, must use checks on a bank in the county in which the Employee is working. A statement of wages and deductions must accompany the check or pay envelope but not be a part of the checks so that the Employee may keep the statement of wages and deductions for

his/her own records. If a payroll check has been returned by a bank because of insufficient or uncollected funds and not made good within two (2) banking days then, at the option of the Union, payment by the company shall thereafter, for the balance of this contract, be made in cash or cashier's check. When Employees are laid off or discharged, they shall be paid in full in United States currency or coin or check on the job immediately and, if required to go to some other point or to the office of the Employer, the Employee shall be paid for the time required to go to such places. When Employees quit of their own accord, they shall wait until the regular pay day for the wages due them.

**3.16 – CHECKING IN AND OUT**: The Employer may utilize brassing, time clocks or other systems to check Employees in and out. Each Employee must check himself in and out. The Employer will provide adequate facilities for checking in and out in an expeditious manner.

**3.17 – WAGE RATES AND FRINGE BENEFITS:** Effective the first payroll period on or after the dates indicated, the hourly rates for each hour worked in the areas described below and fringe benefits shall be paid on a straight time basis (except Annuity) as follows:

**GREATER ORLANDO AREA VICINITY INCLUDING DISNEY:** Work performed within the Greater Orlando area vicinity including Disney.

**BALANCE OF ARTICLE 3.3.3** Work performed in the balance of the territory claimed under Article 3.1.1:

**SEE ATTACHED REVISED WAGE SCALE**

| DETAIL | GREATER ORLANDO AREA VICINITY INCLUDING DISNEY. | | | | | |
|---|---|---|---|---|---|---|
| Effective Date | 07/01/07 | 07/01/08 | 07/01/09 | | | |
| Journeyman | $ 21.55 | $ 22.55 | $ 23.55 | | | |
| Health care | $ 3.65 | $ 3.65 | $ 3.65 | | | |
| Pension | $ 3.00 | $ 3.00 | $ 3.00 | | | |
| Annuity | $ 2.40 | $ 2.40 | $ 2.40 | | | |
| CMF | $ 0.07 | $ 0.07 | $ 0.07 | | | |
| JATC | $ 0.35 | $ 0.35 | $ 0.35 | | | |
| Impact | $ 0.04 | $ 0.04 | $ 0.04 | | | |
| Local Union 808 check-off | 3.% | 3% | 3% | | | |
| Organizing Fund | $0.16 | $0.16 | $0.16 | | | |
| IPAL | $0.04 | $0.04 | $0.04 | | | |
| District Council Ckeck-Off | $0.02 | $0.02 | $0.02 | | | |

Foreman: Working two (2) or more per crew (including foreman) one dollar ($1.00) per hour above Journeyman's scale.

General Foreman: Two dollars ($2.00) per hour above Journeyman's scale.

**3.17.1 – ANNUITY FUND**: Unlike other fringe benefits, the Annuity Fund contributions are figured at the appropriate overtime rate.

**3.18 – UNION CHECK-OFF**: Upon proper authorization as required by law, the Employer shall deduct from the Employee's wages the dues, assessments, and contributions as provided below. Local Dues and Assessments: Upon voluntary authorization by the Employee as required by law, the Employer shall withhold weekly and submit monthly to the Funds Administrator a sum equal to three percent (3%) of gross wages and additional sixteen cents ($0.16) per hour for each hour worked to be allocated by the Union for Organizing.

**3.18.1-DISTRICT COUNCIL DUES AND ASSESSMENTS:** Upon voluntary authorization by the Employee as required by law, the Employer shall withhold weekly and submit monthly to the Funds Administrator a sum equal to two cents($.02) per hour for each hour worked.

**3.18.2-IRON WORKERS POLITICAL ACTION LEAGUE CHECK-OFF:** Upon voluntary authorization by the Employee as required by law, the Employer shall withhold weekly and submit monthly to the Funds Administrator a sum equal to four cents($.04) per hour for each hour worked.

**3.18.3- ELIMINATION OF EMPLOYER'S RESPONSIBILTY:** The parties signatory hereto agree that the funds for the Local dues and assessments, as well as funds for the District Council dues and assessments, and for the Iron Workers Political Action League will be Administered solely by the Union according to the trust documents created solely by the Union. The employer shall have no responsibility or liability for any other check-off monies after forwarding same to the Fund Administrator.

**3.19-APPRENTICES:** Not withstanding provisions contained herein to the contrary, the apprentice to journeyman ratio and/or wage scale or percentages shall be subject to any zone area agreement and/or decision of the Joint Labor/Management Committee.

**3.19.1-APPRENTICE RATIO:** The Employer, with mutual consent, may utilize non-journeymen totally except for two journeymen, one of whom shall be a foreman.

**3.19.2-TERM OF APPRENTICESHIP:** The terms of apprenticeship shall not be less than eight thousand(8,000) hours of reasonably continuous employment in an approved schedule of work experience over a time of not less than four (4) years. This shall consist of not less than eight(8) periods of one thousand (1,000) hours each together with satisfactory completion of the related supplemental instructions.

**3.19.3-APPRENTICE WAGE RATE:** Apprenticeship wages shall be figured at the following percentage of journeyman's scale.

| APPRENTICE CLASS | | RATE |
|---|---|---|
| 1ST 1000 | Hours | 60% |
| 2ND 1,000 | Hours | 65% |
| 3RD 1,000 | Hours | 70% |
| 4TH 1,000 | Hours | 75% |
| 5TH 1,000 | Hours | 80% |
| 6TH 1,000 | Hours | 85% |
| 7TH 1,000 | Hours | 90% |
| 8TH 1,000 | Hours | 95% |

**3.19.4-FRINGE AND OTHER CONTRIBUTIONS:** Employer contributions for Apprentice Iron Workers shall be paid in accordance with this Collective Bargaining Agreement; however, Employer contributions shall not be required by, nor paid into the annuity and pension trust funds. Fourth Year Apprentice's will receive the pension benefits.

## ARTICLE 4-JURISDICTIONAL DISPUTES

**4.1-** In the event of any dispute as to the jurisdiction of work covered by the terms of this Agreement being claimed by Unions, including, but not limited to, those affiliated with the Building and Construction Trades Department, AFL-CIO, then such dispute shall be referred to the International Unions involved for determination by whatever procedures they may adopt, and the work shall proceed as assigned by the individual Unions in any given Jurisdictional determination and shall be implemented immediately by the individual Employer involved.

**4.1.1-**Agreements, national in scope, between said International Association and other International Unions, covering work jurisdiction and allocation and division of work among Employees represented for the purpose of collective bargaining by such labor organizations, shall be respected and applied by the Employer.

**4.1.2-:** There shall be no strikes, work stoppages, or other interferences with the work by reason of jurisdictional disputes, and the Union shall forthwith strictly cause this provision to be enforced by its member Employees.

## ARTICLE 5 - STIKES AND LOCKOUTS

5.1-: There shall be no strikes, work slowdowns, walk-offs, or other actions for any reason, including, but not limited, to, jurisdictional disputes and/or pickets, which may interrupt or impede production. All Employees will be at their proper posts, as determined by the Employer, regardless of any action taken by any other labor organization, other Employer, owner, or other entities. There will be no lockouts of Employees covered by this Agreement.

## ARTICLE 6 – GRIEVANCE PROCEDURE

6.1 -: All questions and disputes arising between a Employer and an Employee regarding wages, hours, working conditions under this Agreement (excepting there from Management's Functions and Prerogatives), unless otherwise specifically provided herein, violation of any Article of this Agreement shall be handled under the following procedure:

STEP 1: When any Employee subject to the provisions of this Agreement feels a violation of this Agreement has occurred, he/she through His/her Local business representative, within three (3) calendar days after the occurrence of a dispute, shall give written notice to the Employer stating the Article alleged to have been violated. Failure to raise any dispute within three (3) calendar days of its occurrence renders the dispute null and void. The Union business representative and the representative of the Employer shall meet within three (3) calendar days after timely notice has been made and endeavor to adjust the matter. If they fail to do so, Step 2 of this procedure may be pursued within forty-eight hours thereafter. (b) Should the Union or the Employer and/or MFSEAI have a dispute with the other and if, after conferring, a settlement is not reached, the Employer and/or MFSEAI and the Union may proceed in the same manner as outlined herein for an Employee complaint.

STEP 2: A representative of the Union and a representative of MFSEAI shall meet within five (5) calendar days after the expiration of the time limits in Step 1, in an attempt to reach an agreement. If these parties fail to reach an agreement, the dispute may be referred in writing in accordance with the provisions of Step 3 within three (3) calendar days thereafter.

STEP 3: If the grievance has been submitted but not adjusted under Step 2 and a timely appeal is filed, the parties shall in writing submit the grievance clearly and in detail, setting forth the facts in the matter to the Joint Grievance Committee. The appeal, via certified mail with one copy to the Union business representative and one copy to the President of MFSEAI shall constitute notice to the Joint Grievance Committee. The Joint Grievance Committee shall, at all times,, consist of the Union business representative, or his designated representative , the President of MFSEAI or his designated representative, and a third impartial arbitrator selected by the representatives of the Union and MFSEAI. If the representatives of the Union and MFSEAI are unable, within three (3) Working days, to agree on a third arbitrator, they shall promptly request the Federal Mediation and Conciliation Service to furnish a panel of five (5) names from which a third member shall be selected. The Joint Grievance Committee shall then meet with the parties to the dispute within three (3) working days. The Joint Grievance Committee must render its decision orally within three (3) Working days and the same shall be published within fourteen (14) calendar days. The decision of the Joint Grievance Committee shall be final and binding on both parties.

6.2 -: Except by mutual agreement, all timeliness provisions must be complied with and failure to comply by either party will result in default by that party of its position.

6.3 -: If any such question or dispute involves a jurisdictional matter and the same is not resolved by the representative of the Union and the representative of MFSEAI as representative of the Employer, then the same shall promptly be referred to the International Association of Bridge, Structural, Ornamental, and Reinforcing Iron Workers as set forth in Article 4.

6.4 -: This Agreement (including, but not limited to, decisions of the Joint Labor Management Committee (LMC) shall not be changed or altered by the Joint Grievance Committee nor shall the Committee have authority or jurisdiction to arbitrate delinquent, late and/or nonpayment of fringe benefit contributions, judgments, opinions, and/or be held liable for deliberations, judgments, opinions, and/or decisions rendered and/or agreed upon.

6.5 -: The parties to the dispute shall equally share the expenses of the Joint Grievance Committee. If any Employer or Union fails and/or refuses to abide by a decision of the Joint Grievance Committee, that party shall be liable for any reasonable attorney's fees and court costs incurred in enforcing the decision in a court of competent jurisdiction.

6.6 -: If the Union or the Employer violates any one or more provisions of this Agreement, said party shall be responsible for those certain damages suffered by MFSEAI, the Employer, the Union, or the Employee, as the case, may be. Such damages may include, but not be limited to, losses, fund contributions, cost or arbitrators, wages, fringe benefits lost and/or deprived the Association, the Union, its members, or the Employer, as the case may be. The Joint Grievance Committee shall have the power to determine the amount of damages subject to the limitations

imposed upon the Committee as set forth in this Agreement, and the decision of the Committee so rendered shall be final and binding on all parties and shall be enforceable in any court of competent jurisdiction. The Union, through Its official representative to the Employees and parties concerned, shall issue all statements as to the Union's position concerning this Agreement, and MFSEAI shall, through its official representative to the Employers and parties concerned, issue all statements as to the Employer's position concerning this Agreement.

6.7 - : Each Employer signatory to this Agreement, having recognized MFSEAI as its exclusive bargaining agent for all mandatory and discretionary subjects of collective bargaining including, but not limited to, wages, hours, working conditions, fringe benefits, fund contributions, administration of this Agreement during the term of this Agreement, and any extensions, additions, or modifications, thereof, acknowledges that MFSEAI, as to all matter in, under, and during this Agreement (including, but not limited to, decisions of the Joint Labor Management Committee and Grievance Committee), shall not be held liable for its deliberations, judgments, opinions and/or decisions rendered and/or agreed upon, respecting this Agreement, its administration and/or modification.

## ARTICLE 7 – JOINT LABOR/MANAGEMENT COMMITTEE

7.1 - : Notwithstanding anything that may be contained elsewhere in this Agreement, the Joint Labor/Management Committee (LMC) shall be established and shall consist of not more than two representatives appointed by the Union, one of which shall always be the Union business representative and two representatives appointed by the MFSEAI, one of which shall always be the President of MFSEAI, or his designated representative, and shall be responsible for studying, monitoring, and reacting to market conditions and shall be empowered to adopt provisions and/or modifications regarding matters covered by the Collective Bargaining Agreement as the LMC may deem necessary in order to implement the Labor/Management Program for the mutual benefit of the Union, Employees, MFSEAI, and Employers through the Joint efforts of the LMC. The Joint Labor/Management Committee may establish special zoned areas (which may consist of one or more jobsites). Further, the Committee shall have the authority to discuss, resolve, and adopt modifications to this Collective Bargaining Agreement that shall apply, govern, and bind the parties to work performed only within such geographic zone or uniformly throughout the jurisdiction of this Agreement providing same shall not be arbitrary and shall primarily serve to promote, secure, and extend the scope of employment of Iron Workers subject to this Agreement and securing opportunities on a more competitive basis in said zoned area.

7.2 - : Any signatory Employer may request a special zoned area be established by submitting such a request in writing to the LMC. Geographically, a zoned area, as the context applies, may consist from a single jobsite to the entire jurisdiction of this Agreement. The zoned area may provide a different basis for the work performed from that of another zone or that of the balance of the jurisdiction of this Agreement but shall, nonetheless, be uniform within said zone for all Employers. Zone Area Agreements shall be effective during the term of this Agreement and, unless otherwise provided by the LMC, shall continue thereafter in said zone area until termination by the LMC. In each instance, termination shall not affect any work heretofore contracted for, commenced, or otherwise not completed within the respective zone area.

7.3 - : The Joint Labor/Management Committee shall have the right nevertheless, to adopt modifications to this collective Bargaining Agreement and/or resolve all issues and matters covered by this Agreement within the jurisdiction of this Agreement or said zone area (except Management Functions and Prerogatives) and enter into said agreements solely upon a unanimous vote of the Committee approving said agreements. Accordingly, since this Committee is comprised of an equal number of representatives of both the Union and MFSEAI, the parties hereto consent to said agreements which may be adopted from to time to time by the Committee except the Committee may never change the unanimous vote requirement needed to implement the special zone area and approval of any special terms to work therein. The modifications contained within said Agreements shall be deemed to be a part of this Collective Bargaining Agreement as though fully and length set herein.

7.4 - : Each Employer shall ascertain for itself whether or not prospective work which it may perform will be in a special zone area wherein modifications, if any, of this Collective Bargaining Agreement shall be affected so as to be governed thereby. This information is available, upon request, from either the Union or the MFSEAI.

7.5 -: For the purpose of this Savings Clause, it is understood by the parties hereto that any modifications entered into by the LMC of this Collective Bargaining Agreement for specific zoned areas shall not be deemed to carry over or apply outside said zoned areas as a more favorable condition. However, any such modifications shall apply to all Employers only within the zoned area.

## ARTICLE 8 – STEWARDS

8.1 : The Union may appoint a working steward from among the Employer's Employees. The steward's duties

shall be confined to the Employer's work only and he shall not interfere with any Employer's work. The job steward will not be permitted to make job decisions unless covered by this Agreement. All complaints and grievances shall be made through the job steward who will notify the Employer and, if the complaint or grievance is not immediately adjusted, the Local Union business agent will be notified and will confer with the Employer. No work stoppages will be permitted.

8.2 -: The Employer will notify the Union prior to the discharge of a steward and, further, when Employees are laid off, the job steward will be the last Iron Worker laid off excluding the foreman on the job, providing the steward is capable of performing the work in progress.

8.3 - : Employers will make available to the union on a monthly basis all employee time sheets. This will be done on a monthly basis (Time Sheets).

## ARTICLE 9 – GENERAL CONDITIONS

9.1 : **WORK LIMITATIONS**: There shall be no limitations placed on the amount of work to be performed by any Employee during the working hours.

9.2 -: **DOUBLE JOBS:** No Employee will be permitted to receive wages for more than one job at the same time.

9.3 -: **WORKERS' COMPENSATION INSURANCE**: The Employer must, at all times, provide workers' compensation insurance.

9.4 -: **OSHA** The provisions of the Occupational Safety and Health Act of 1970 are made a part of this Agreement by reference thereto.

## ARTICLE 10 – BUSINESS REPRESENTIVE ON JOB

10.1 : After checking in at the Employer's jobsite office, the Local Union business representative shall be permitted on the job but shall not, in any way, interfere with the Employees during working hours unless permission is grated by the Employer.

## ARTICLE 11 – MAINTENANCE OF STANDARDS

11.1 - : The Union agrees that each Employer shall employ Iron Workers under the same Agreement as contained herein. Specifically, the Union agrees that no Employer shall be given permission to engage any Iron Worker, or any one under the control of the Union, upon more favorable terms and conditions than those available to, or imposed upon, the Employer bound by this Agreement, and, if any more favorable terms or conditions are offered, given, or allowed to any Employer, the Employer shall be entitled to thereupon avail himself of and abide by such more favorable conditions. Whether or not a privilege, term, or condition of employment is more advantageous shall be determined solely by such Employer.

## ARTICLE 12 – SUBSTANCE ABUSE PROGRAM

12.1 -: The Union and the Employers recognize that Employee use of drug and alcohol is a safety and health hazard that has an intolerable cost impact on the Employee and his or her family's health and welfare. Further, Employee use of drugs and alcohol result in high rates of absenteeism and an increased incidence of accidents involving the Employee and the Employee's co-workers, thus, increasing the Employer's costs. Increased costs reduce contracting opportunities for the Employer and employment opportunities for the Employee.

12.2 - : It is the objective of the Union and Employers to establish and maintain a work environment that is free from the effects of drug and alcohol use. Therefore, any Employer under this Agreement may establish a substance abuse program in compliance with Federal, State or Local Laws, including but not by way of limitation, Drug Free Workplace FS 440.101, 440.102, and Rule 38F-9, Florida Administrative Code, established by the State Of Florida, Department of Labor and Employment Security, Division of Workers' Compensation Insurance.

12.3 - : The Apprenticeship Trustees have developed a ten (10) page document titled DRUG- Substance Abuse Policy, IRON WORKERS LOCAL UNION 808 AND MID FLORIDA STEEL ERECTORS ASSOCIATION, INC. and SIGNATORY EMPLOYERS. The program is jointly directed and implemented through a joint agreement and is maintained by contributions paid by Employers at the rate of five cents ($.05) per hour. Payments into the program shall be made in the same manner as payments into the various Funds. The program is in full force and effect and applies to this contract. If anyone would like a copy, please contact the Local Union.

12.4 -: Any Employee in possession of drugs, or under the influence of alcohol or drugs, will be terminated.

## ARTICLE 13 - SAFETY

13.1 -: The Employer and the Employee will conform to all Federal, State, and Employer's health and safety regulations applicable to work covered by this Agreement and the general working rules of the International.

13.2 -: The Union and the Employer agree, in the interest of safety and a condition of employment, all Employees will comply with the Employer's safety and health rules.

## ARTICLE 14 – HEALTHCARE, PENSION, APPRENTICESHIP, AND ALL OTHER FUNDS

**14.1 -: FUNDS ESTABLISHED**: Each of the following jointly administered Trust Funds, for the separate purposes hereinafter set forth, having been established by appropriate Agreements and Declaration of Trusts, are hereby continued.

**14.1.1- RATIFICATION OF TRUSTS**: Each Employer hereby ratifies the Agreements, Declarations of Trusts, rules and regulations thereof, including all collection procedures rules and bonding procedural requirements now or hereafter established by the trustees of the jointly administered funds and any amendments or restatements thereof as fully as if such Employer was signatory to such document.

**14.1.2 – TRUST DOCUMENTS**: Trust Agreements and rules and regulations, including collection procedure and bonding requirements of the jointly administered funds are available for contributing Employers to examine at the offices of the Funds Administrator.

**14.1.3 – TERMINATION OF FUNDS;** The separate funds hereby created, and all trusts and escrow agreements created pursuant thereto, shall be wound up, terminated, and become null and void upon the failure of the Association and the Union to reach a new Agreement continuing the said funds, or upon cancellation of this Agreement.

14.1.3.1 -: The parties hereto expressly agree that the continuation of the funds is a proper subject for bargaining and that, upon expiration or cancellation of this contract, either party may condition its bargaining with relation to the continuation of either of said funds upon the agreement of the other party to, in good faith, negotiate with the view of both parties toward continuation of the other fund.

**14.1.4 – MUTUALITY OF TRUSTS AND AGREEMENT**: The terms of these Funds, and the Agreements and Declaration of Trusts with respect thereto, shall be identical with the terms of this negotiated Agreement, and any renewal or extension thereof by the Union and the MFSEAI.

**14.1.5 – JOINTLY ADMINISTERED**: It is understood that the Funds shall be jointly administered pursuant to the Trusts Agreements and Plan of Benefits established, shall be administered in accordance with Section 302, of the Taft-Hartley Act, as amended, and all applicable laws; the Board of Trustees for the various Funds may, in their discretion and by appropriate action taken under the terms and procedures of the Funds' Trusts Agreements, without further notice to or action by the parties to this Agreement, approve, adopt, and execute, as a signatory the "Ironworkers International Reciprocal Agreements" as adopted, which may from time to time be amended.

**14.1.6 – TRUSTEE APPOINTMENT:** Three (3) Management trustees on each of the various Fringe Benefits Funds shall be appointed by the MFSEAI and three (3) Union trustees shall be appointed by the Union . One (1) Management trustee on the Southeast Ironworkers Healthcare Fund shall be appointed by the MFSEAI and one (1) Union trustee shall be appointed by the Union. Each of the Agreements, Declarations of Trust, rules and regulations thereof, including all collection procedures rules and bonding procedural requirements referred to herein, shall be deemed incorporated by reference into this Agreement and made a part hereof.

**14.2 - SOUTHEASTERN IRONWORKERS HEALTHCARE FUND**: Shall be maintained for the sole purpose of providing such welfare benefits as may be determined by the Trustees of the Fund selected or created by the MFSEAI and the Union, subject to the limitations set forth in Section 302 of the Taft-Hartley Act, as amended, for ironworkers and apprentice ironworkers for whom contributions shall be made, and for members of their respective families.

**14.2.1 – "A" PLAN:** is for Journeymen and Non-Journeymen not covered by Plan "B".

**14.3 – IRON WORKERS LOCAL UNION 808 PENSION FUND:** shall be maintained for the sole purpose of providing such pension benefits as may be determined by the Trustees of the Fund selected or created by the MFSEAI and the Union, subject to the limitations set forth in Section 302 of the Taft-Hartley Act, as amended, for Journeymen for whom contributions shall be made.

**14.3.1 - :** The Iron Workers International Reciprocal Pension Agreement, Exhibit "A", "Money follows the man" for Employer contributions on Employees whose "Home Local" is outside the jurisdiction of this Collective Bargaining Agreement as adopted and may from time to time be amended, is adopted.

**14.3.2 –:** Apprentices 1st year through 3rd year, trainees and/or non-journeymen are not eligible for pension benefits. Employer contributions to the Pension Trust Fund commence upon the first full pay period following the attainment of journeymen status by such apprentices, trainees and/or non-journeymen. 4th year apprentices receive pension.

**14.4– IRON WORKERS INDUSTRY OF MID FLORIDA JOINT APPRENTICES PROGRAM FUND:** shall be maintained for the purpose of training of apprentices and trainees, and may be used for further training of journeymen ironworkers in the methods and techniques of the trade.

**14.14.1 – APPRENTICESHIP CONTRIBUTION:** Twenty five cents ($.25) of the Employer's contributions shall be allocated to fully support and pay for the expenses of the Apprenticeship Training Program, including the expense of the first examination for welder's certification. The budget and curriculum of the Apprenticeship Training Program shall, at all times, be jointly administered and decided upon by the Joint Apprenticeship Committee.

**14.4.2 – JOURNEYMAN UPGRADE FUND CONTRIBUTION:** Five cents ($.05) of the Employer's contributions shall be allocated to fully support and pay for the expenses of the Journeyman Upgrade Fund, including the expense of the first examination for welder's certification. The budget and curriculum of the Journeyman Upgrade Program shall, at all times, be jointly administered and decided upon by the Joint Journeyman Upgrade Committee.

**14.4.3 - :** A standing list of all apprentices is to be submitted to MFSEAI monthly.

The Union and the MFSEAI, respectively, agree to take disciplinary action against all apprentice applicants and/or apprentices for receiving wage rates other than prescribed by and established in this Collective Bargaining Agreement's schedule of rates for apprentices.

**14.4.5 - :** The Apprenticeship Training Program has a drug-free workplace and substance abuse policy that is paramount to the program.

**14.5 - NATIONAL APPRENTICE TRAINING FUND I.M.P.A.C.T.:** Contributions into the National Iron Workers and Employers Apprenticeship Training and Journeyman Upgrading Fund will now be paid through **I.M.P.A.C.T.** and shall be made in the same manner as payments to the other funds set up in this Agreement.

**14.6 – IRON WORKERS POLITICAL ACTION LEAGUED CHECKOFF:** Upon voluntary authorization by the Employee as required by law, the Employer shall withhold weekly and submit monthly to the Funds Administrator a sum equal to four cents ($.04) per hour for each worked.

**14.7 – ANNUITY FUND:** A jointly administered Annuity Trust Fund, known as the Iron Workers Local 808 Annuity Fund, created by an Agreement and Declaration of Trust, shall be continued.

**14.7.1 - :** Apprentices, are not eligible for annuity benefits. Employer contributions to the Annuity Fund commence upon the first pay period following the attainment of journeyman status by such apprentices.

**14.8 – IRONWORKERS CHARITY CHECKOFF:** Upon voluntary authorization by the employee as required by law, the employer shall withhold weekly and submit monthly to the Funds Administrator a sum equal to one cent ($.01) per hour for each hour worked. These amounts will be paid into a separate account of the organizing fund for the purpose of making contributions to charities of the Local's choosing, including but not limited to payment to individual ironworkers in need of assistance resulting from economic hardship.

**14.90 – SUBSTANCE ABUSE PROGRAM:** The Substance Abuse Program is jointly directed and implemented through a joint agreement and is maintained by Employer contributions. Payments into the Program shall be made in the same manner as payments into the various Funds.

**14.10 - INSTITUTE OF THE IRONWORKING INDUSTRY I.M.P.A.C.T:** The Employer agrees to contribute to I.M.P.A.C.T which will now encompass the Institute of the Iron-working Industry, Inc. Payments will be reported and paid on the combined contribution form which will be furnished monthly by the administrator of the fringe benefit office.

**14.11 – CONTRACT MANAGEMENT FUND**: Each Employer signatory to this Agreement recognizes that there are costs, fees and expenses attendant to the preparation for, during and attaining of a Collective Bargaining Agreement which subsequently continues during the administration of the Collective Bargaining Agreement, its modification and clarifications, if any.

**14.11.1 -:** The Union recognizes the need for providing a means by which Management may prepare for, conduct and administer to the Industry's Collective Bargaining Agreement and its modifications from time to time. The Union also recognizes that by the use of the CMF, Management will be better able to collectively bargain on behalf of the Employers for whom it serves as representative, leading to the ability to resolve contract disputes. between labor and management.

**14.11.2 -:** Accordingly, in order to fairly and equitably apportion these necessary costs, fees and expenses for both the collective bargaining process and the administration of this Agreement as it may be modified during the term of the Agreement. This Fund shall be exclusively administered by Management through MFSEAI representatives and the Union shall have no control, power or rights with respect to the CMF, and any disbursements there from shall be at the discretion of the MFSEAI.

**14.2 - DISTRICT COUNCIL CHECK-OFF**: The District Council Fund shall be applied to Labor's cost of labor relations, collective bargaining, industry relations, public relations, and all matters and problems incidental , to the cost of maintaining facilities, arbitration, disputes, and adjustment of grievances, promotion of safety programs, and other industry costs.

**14. 13 – ORGANIZING FUND CHECKOFF**: The Organizing Fund shall be applied to Labor's cost of organizing and recruiting. This fund shall be exclusively administered by LU 808 through LU 808 representatives and the MFSEAI shall have no control; power or rights with respect to the Organizing Fund; and any disbursement there from shall be at the discretion of LU 808.

**14.14 – FUNDS PROTECTION:** The contributions, dues check-off, and political action contributions, are required to be paid to the Funds' Escrow Agent, for each hour worked in the Union's claimed territorial jurisdiction by each Employee covered under this Agreement are as follows:

**14.14.1 – TEN SEPARATE FUNDS:** TEN (10) separate and independent Funds, for the purpose herein set forth are to be financed by the Employer contributions as herein provided, to be know as:

Southeastern Ironworkers Healthcare Fund, Iron Workers Local Union 808 Pension Fund, Iron Workers Local Union 808 Annuity Trust Fund, Iron Workers Industry of Mid Florida Joint Apprenticeship Training Fund, Journeyman Upgrade Fund, Management Contract Fund, National Ironworkers and Employers Apprenticeship Training and Journeyman Upgrading Fund (NIEATJUF), Institute of the Ironworking Industry, Substance Abuse Trust Fund, and Ironworkers Charity Fund.

**14.14.2 – FOUR SEPARATE FUNDS:** FOUR (4) separate and independent Funds, for the purpose herein set forth are to be financed by payroll deductions as herein provided, to be know as:

International Political Action League, District Council, Organizing Fund, and Check -off.

**14.14.3 -: CONTRIBUTIONS**: The contributions provided for herein shall be subject to and entitled to all the provisions of the Agreements and Declaration of Trust established herein, as adopted and as may be amended from time to time by the appropriate Board of Trustees of the Funds.

**CAPE CANAVERAL, ETC.** Work performed within the boundaries of Cape Canaveral Air Force Station, Patrick AFB, Kennedy Space Flight Center and Malabar Radar site.

**CAPE CANAVERAL, ETC** Work performed within the boundaries of Cape Canaveral Air Force Station, Patrick AFB, Kennedy Space Flight Center and Malabar Radar Site:

| DETAIL | CAPE CANVERAL, ETC | | | | | |
|---|---|---|---|---|---|---|
| Effective Date | 07/01/07 | 07/01/08 | 07/01/09 | | | |
| Wage scale | $22.83 | $23.83 | $24.83 | | | |
| Healthcare | $ 3.65 | $ 3.65 | $ 3.65 | | | |
| Pension | $ 3.00 | $ 3.00 | $ 3.00 | | | |
| Annuity | $ 2.40 | $ 2.40 | $ 2.40 | | | |
| CMF | $ 0.07 | $ 0.07 | $ 0.07 | | | |
| JATC | $ 0.35 | $ 0.35 | $ 0.35 | | | |
| IMPACT | $ 0.04 | $ 0.04 | $ 0.04 | | | |
| | | | | | | |
| Local Union 808 Check-Off | 3% | 3% | 3% | | | |
| Organizing Fund | $0.16 | $0.16 | $0.16 | | | |
| IPAL | $0.04 | $0.04 | $0.04 | | | |
| District Council Check-Off | $0.02 | $0.02 | $0.02 | | | |
| | | | | | | |

**14.14.3.1 – ANNUITY CONTRIBUTIONS:** All contributions to the Annuity Fund shall be paid at the appropriate overtime rate for all hours paid, (i.e, on a 48 hour week, the contribution rate is 40 hours at the contribution rate and 8 over-time hours at the contribution rate times 1.5 or 2 (as the case may be).

**14.14.4 – OTHER CONTRIBUTIONS:** All other contributions shall be paid at the appropriate rate for all hours paid. No overtime premium shall be paid.

**14.14.5 – ALLOCATION OF CONTRIBUTIONS:** Upon receipt of the Employer's contributions, the Escrow agent will separate and allocate the contributions into separate Funds in the amount herein respectively designated.

**14.14.6 – BONDING:** All Employers who do not have their principal place of business in the geographical area covered by this Agreement, or who are not signatory to the Iron Workers International Agreement, must post a bond to insure payment to all funds heretofore mentioned in this Agreement; and this provision shall apply to all Employers who are continually delinquent in payment to the funds. The amount of the bond shall be fifteen percent (15%) of the total contract as related to the work of the Iron Worker. Any Employer who does not have his principal place of business in the geographical area covered by this Agreement, or who the trustees find has been, or is, delinquent in payment of fringe benefits in any other area of the United States, may be required, by the trustees, to prepare estimated benefits and pay in cash on a monthly basis. The amount of prepayment required per month shall be established by the trustees, and any overpayment of the prepayment shall be applied toward the fringe benefits for the following month. The prepayment requirement may be continued from month to month by the trustees until they are satisfied that the payment will be made on a timely basis by the Employer.

**14.14.7 – OBLIGATION TO PAY CONTRIBUTIONS:** Notwithstanding any other provision of this Agreement, the obligations to make fund contributions at the rates set forth herein and under the terms and conditions set forth herein shall continue beyond any expiration date of this Agreement until the date the Employer executes or becomes bound by a successor collective bargaining agreement or notifies the trustees, in writing, that it is bargaining with the Union for a successor agreement and that an impasse in such bargaining has been reached and notifies the trustees of the specific date that such an impasse was reached.

**14.14.8 – AGGREGATE CONTRIBUTIONS:** In order to reduce the book and record keeping burdens on the Employer, said Employer will make contributions to each of the separate funds in a single monthly payment in the manner hereinafter provided, and said contributions shall be made directly to Advanced Administration, Inc., and Gem Group Fund Administrators, until further notified, or such other corporate fiduciary as shall be mutually agreed upon by the Association and the Union with notice of such successor given to the Employer. Contributions and reports shall be made by each Employer and shall be properly mailed and/or hand delivered to said Funds Administrator, or successor, on or before, the fifteenth (15th) day of the month immediately following the contribution period covered for the month immediately preceeding. For example, when Employees have worked

during the month of May, reports together with the proper fund contributions shall be due delivered by hand or U.S. mail (with proper postage thereon) to the Funds Administrator not later than the 15th day of the next month, to wit: the 15th day of June. Simultaneously with the making of said payment of the contributions, each Employer shall also file a written report (on a form approved by the funds) with the said Funds Administrator, or successor, setting forth the name, social security number, gross wages, dues check-off, and hours worked by each journeyman, foreman, and apprentice iron worker, or others performing iron workers' work for whom contributions shall have been made during said period.

**14.14.9 – WEEKLY CONTRIBUTIONS**: Employers who are on weekly reporting and payment of fringe contributions shall do so on a timely basis in accordance with the collection policy and/or bond requirement policy adopted by the Board of Trustees. Employers will file, weekly or monthly, a report showing " No men for period covered by this report", when such is applicable, and "Final Report" when Employees covered by this Agreement are no longer expected to be employed.

**14.14.10 -NON-PAYMENT AND/OR DELINQUENCY IN THE PAYMENT OF ANY ONE OR MORE OF THESE FUNDS SHALL CONSTITUTE A BREANCH OF THE AGREEMENT**: Upon the failure of the Employer to make timely contributions, including liquidated damages, interest, costs, and attorney's fees, to any of the aforesaid funds, the trustees of the said jointly administered funds may refer the collection of any sums so due to the Fund Attorney and the Employer, in that event, agrees to pay, in addition to the monies owing, all collection expenses, including court costs, collection, and auditor's fees. Resort, or failure to resort, to this remedy shall not be deemed a waiver of the right to resort to any other legal remedy at some future or subsequent time.

**14.14.11 - COST OF COLLECTION**: In the event of a delinquency, the trustees of the jointly administered funds may require the payment by Employers of liquidated damages as set forth herein, interest as set forth herein, and of other costs and expenses, including cost of an audit and a reasonable attorney's fee (of not less than 20% of the delinquency) arising out of the verifications and collection of such Employers' delinquent contributions.

**14.14.11.1 -**: In any action under 29 USC-1132 to enforce 29 USC-1145 in which judgment in favor of the fund is awarded, the Employer shall be required to pay interest at the rates set forth herein below plus an assessment of 8%.

**14.14.11.2 -**: In the event of a delinquency with respect to which the above statute does not apply, the Employer shall be obligated to pay, in addition to the delinquent amount, the following:

(1) interest from the first day of the second month after the month in which the work was performed at the rate of 8% per annum, or .667% interest added to all monies due as March 1 for work performed in January; and,

(2) interest increased on all monies due and unpaid as of the first day of the third month after the month in which the work was performed at the rate of 10% per annum or .833% per month added to all monies due and unpaid as of April1, for work performed in January and February; and,

(3) interest increased on all monies due and unpaid as of the first day of the fourth month after the month in which the work was performed at the rate of 12% per annum, or 1.0% per month added to all monies due as of May 1, for work performed in January, February and March; and,

(4) an additional 8% will be assessed on all monies due and unpaid as of the first day of the fourth after the work was performed, i.e., a Flat 8% added to all monies due as of May 1 for work performed in January, February and March; and,

(5) All current payments will be allocated FIFO, oldest delinquent monies are deemed paid first.

**14.14.12 - COST OF AUDITING**: The cost of auditing shall be borne by the respective Trusts Funds, unless the Employer is found to be delinquent in his contributions to the Funds at the time the audit was commenced, then the Employer shall bear the cost of the audit. If any Employer refuses to permit an examination audit, the Trustees may institute suit requiring and audit. In such event all cost incidental thereto, including attorney's fees and court costs, shall be paid by the Employer regardless of whether or not the Employer is found to be delinquent at the time the audit was commenced. The Employer further acknowledges that attorney's fees may be recovered in any action or proceeding for unpaid wages under this Agreement whether or not contributions remain unpaid.

**14.14.13 - PRODUCTON OF RECORDS**: Each Employer shall promptly furnish for inspection to the trustees or their designee, on demand, all payroll records relating to all Employees (not only those Employees conceded by the Employer to be covered by a collective bargaining agreement requiring contributions to the fund). The payroll records required to be produced shall include but not be limited to: (1) IRS Form 941; (2) Unemployment

Compensation Tax Form UCT-6 (3) payroll journal; disbursements journal, payroll subsidiary; (4) time and job record cards; (5) listing or schedule of subcontractors; (6) all other payroll records.

**14.14.14 – EMPLOYER FURNISHED INFORMATION**: Each Employer shall promptly furnish to the trustees, on demand, the names of his Employees, social security numbers, the hours worked by each Employee, and such other information as the trustees reasonably require in connection with the administration of the Trust Fund and for no other purpose. The trustees may by their representatives, examine the pertinent employment and payroll records of each Employer at the Employer's place of business when ever such examination is deemed necessary or advisable by the trustees in connection with the proper administration of the Trust Fund.

**14.14.15 – UNION FURNISHED INFORMATION**: The Union shall, upon the request of the trustees, promptly furnish information available to it in respect to an Employee's employment status. The cost of auditing and attorney's fees shall be borne by the respective Trust Funds. Unless the Employer is found to be delinquent in his/her contributions to the funds at the time demand for audits is made the Employer shall bear the cost of the audit. If any Employer shall refuse to permit such examination and/or audit, the trustees may then institute suit to require said audit and any costs incidental thereto, including, but not by way of limitation, all attorney's fees and court costs, shall be paid by the Employer. The Employer further acknowledges that attorney's fees may be recovered in any action or proceeding for unpaid wages under this Agreement.

**14.14.16 – EQUALIZATION OF CONTRIBUTIONS**: In order to eliminate any competitive advantage to any Employer obligated to make payments at the rates set forth herein, a Employer is not required to make Contract Management Fund payments who notifies the escrow agent in writing simultaneously with the payment of contributions hereunder that such Employer is not required, and does not wish, to make Contract Management Fund payments. He/she shall have the full seven cents ($.07) contribution allocated to the Apprenticeship Fund, making a total of thirty-six cents ($0.36) Otherwise, the Employer will pay the seven cents ($.07) contribution to the Contract Management Fund and twenty-nine cents{$.29} to the Apprenticeship Fund.

## ARTICLE 15- CALL BY NAME

**15.1-** In order to ensure that Employers have a steady source of **competent** Employees whose skills are known to them, the Employer shall have the right , on any job, to request by name any applicant for employment accordingly to classification and/or qualification on "A" List and Apprentices. The requesting Employer shall confirm the request in writing to the Union within seventy-two (72) hours.

## ARTICLE 16- REFERRAL OF EMPLOYEE APPLICANTS

**16.1.1-HIRING HALL AGREEMENT:** In order to maintain an efficient system of production in the industry, to provide for an orderly procedure of referral of applicants for employment. and to preserve the legitimate interests of the Employees in their employment, the Employer and the Union have agreed to a plan of referral of applicants to employment. Such Plan of Referral, available for Employer's inspection at the offices of Local Union 808 and the offices of the Mid Florida Steel Erectors Association, Inc., is adopted by this Agreement as if it were set forth fully and at length herein.

**16.2 – EMPLOYER'S RIGHT TO EMPLOY**: The Employer shall have the right to employ directly a minimum number of key Employees who may consist of a superintendent, general foreman, and foreman. In addition the Employer shall have the right to employ directly, on any job in the locality in which the Employer maintains a principal place of business, all Employees required on such job or jobs, provided such Employees are regular employees of the Employer who have been employed by him forty percent (40%) of the working time of the applicant during the previous twelve (12) months. On jobs located outside the locality in which the Employer maintains a principal place of business, the Employer shall have the right to ship and may maintain a ratio of forty percent (40%) of his Employees on the job. The remaining sixty percent (60%) of his Employees shall be referred by the Local Union having jurisdiction.

**16.3 – EMPLOYER'S RIGHT TO TRANSFER EMPLOYEES**: No provision of this Article shall constitute a limitation on the right of an Employer to transfer Employees on his payroll from time to time and from place to place at the discretion of the Employer. Employers who assign Employees to work in the jurisdiction of another Local Union covered by this Agreement shall notify said Local Union that the Employee is working in the Local's jurisdiction. This notification shall be by FAX transmission or by mail within(24) twenty-four hours, excluding Saturdays, Sundays and recognized holidays.

**16.4 – OTHER EMPLOYEES**: All other Employees required by the Employer shall be furnished and referred to the Employer by the Union.

**16.5- EMPLOYER RIGHT TO REJECT**: The Employer shall have the right to reject any applicants referred by the Local Union. No individual who is rejected by the Employer shall be referred back to such Employer. If an Employer does not want an applicant that has been rejected to be referred back to such Employer, a letter of no re-hire must be sent to the Union.

**16.6 – 24 HOUR REQUIREMENT**: In the event the referral facilities maintained by the Local Union are unable to fill the requisition of an Employer for Employees within a twenty-four (24) hour period (Saturdays, Sundays and holidays exception), the contractor may employ applicants from any source. In such event, the contractor will notify the appropriate Local Union of the names, addresses, social security numbers, and dates of such hiring. Such notification shall be given promptly for referrals for said Employees.

**16.7 APPRENTICES**: shall be hired and transferred solely in accordance with the applicable Apprenticeship Standards Agreement.

**16.8 – EQUAL EMPLOYMENT OPPORTUNITY**: The Employers and the Union recognize they are required by law not to discriminate against any person with regard to employment or union membership because of race, religion, age, color, sex, national origin, or ancestry, and hereby declare their acceptance and support of such laws. This shall apply to hiring, placement for employment, training, including apprenticeship.

## ARTICLE 17 – PARTIES SIGNATORY

**17.1 - :** The Union will, immediately upon signing a Employer to the Collective Bargaining Agreement, furnish by mail, within three (3) days of said Employers signing this Agreement, completely signed copies to the Funds Administrators and to the Mid Florida Steel Erectors Association, Inc.

**17.2 -:** Among the additional requirements as a condition precedent or prior to furnishing of Ironworkers, the Union will be initially responsible for determining that the Employer has a proper current license in the city and/or county where said work is being performed; that said Employer has a Certificate of Competency and financial responsibility to effectuate the requirements of this Agreement, having established a place of business with telephone, proper certificate of insurance, with a resubmission annually of said Employer's certificate of coverage establishing the same to be current, and that said Employer has signed a copy of this Collective Bargaining Agreement with signed copies to the Funds Administrator as provided herein. The Union will neither furnish nor permit Iron Workers to be employed by a Employer who has not fully complied with the conditions precedent or who violates or defaults in these conditions.

**17.3 - :** The Union shall make available Ironworkers within its jurisdiction only to such Employers as shall pay the specified wage scale and other considerations set forth in this Agreement.

## ARTICLE 18 – SAVINGS CLAUSE

**18.1 - :** Should any part of, or any provision herein contained (including modifications, if any, adopted by the Joint Labor/Management Committee (LMC) and embodied by reference herein), be rendered or declared invalid by reason of any existing or subsequently enacted legislation, or by any decree of a court of competent jurisdiction, such invalidation of such part or portion of this Agreement shall not invalidate the remaining portions thereof; provided, however, upon such invalidation, the parties signatory hereto agree to immediately meet to renegotiate such parts or provisions affected. The remaining parts or provisions not invalidated shall remain in full force and effect.

## ARTCLE 19 – SCOPE OF AGREEMENT

**19.1 -** : This Agreement contains the full agreement on all subjects upon which the parties did bargain or could have bargained. All matters not included in this Agreement are expressly waived by the Union including, but not limited to, local working conditions, local and/or area practices, and local customs. The Employer retains all rights, power, and authority except those specifically abridged or modified by this Agreement.

## ARTICLE 20 – DURATION

**20.1 - : NOTICE REQUERIMENTS**: This Agreement, with any amendments thereof made, as provided for therein shall remain in full force and effect until midnight, June 30, 2010, and, unless written notice be given by either party to the other at least one hundred twenty (120) days prior to such date of a desire for change therein, or to terminate

the same, it shall continue in effect for an additional year thereafter. In the same manner, this Agreement, with any amendments thereof, , shall remain in effect from year to year thereafter, subject to termination at the expiration of any such extended contract year upon notice in writing given by either party to the other at least one hundred twenty (120) days prior to the expiration of such contract year. Any such notice as hereinabove provided for this Article, whether specifying a desire to terminate or to change at the end of this current contract, shall have the effect of terminating this Agreement at such time.

**20.2 - AGREEMENT REOPENER**: Notwithstanding that set forth in Article 20.1 and elsewhere in this Agreement, either party may give notice to the other, at least 120 days prior to June 30, 2010, to re-open the Agreement for the purpose of negotiating adjustments to the wage rates and benefits of Employees covered hereunder.

**20.3 - OBLIGATION TO NEGOTIATE**: Any proper notice prior to the expiration date or any subsequent anniversary year, as provided for in this Article, given by either party to the other, expressing a desire to change, modify, or amend the provisions of this Agreement, shall not have the effect of terminating this Agreement at that time. In the event no agreement is reached by the due process of negotiations of any subsequent year, either party may give written notice of intention to terminate the Agreement.

**IN WITNESS WHEREOF**, this Agreement has been executed by the parties hereto as of the date and year first above written, in the City of Orlando, State of Florida.

**IRON WORKERS LOCAL 808**

____________________________

**Henry W. Kendrick**
**Business Manager**

____________________________

**Benjamin R. Schmitz**
**President**

**MID-FLORIDA STEEL ERECTORS ASSOCIATION, INC.**

____________________________

**Bill Sheffield**
**Chairman of Negotiations**

**GREATER ORLANDO AREA AND VICINITY IRON WORKERS AGREEMENT**
**LOCAL 808, ORLANDO, FLORIDA**
**Of The**
**INTERNATIONAL ASSOCIATION OF BRIDGE**
**STRUCTURAL, ORNAMENTAL AND REINFORCING IRON WORKERS**

Henry W. Kendrick
Business Manager

200 E. Landstreet Road
Orlando, Fl 32824
407-859-9366

This will acknowledge that the undersigned, acting for and on behalf of

______________________________________________

(Company Name)

hereby accepts, adopts and agrees to be bound by each and every term and provision, including those which create and require contributions to Health and Welfare, Pension, Annuity, and Apprenticeship Funds, for the benefit of Employees and their dependents, and to the Institute of the IRONWORKING Industry, Political Action Fund, Dues Check-off, District Council, and Contract Management Fund, all contained in that certain Collective Bargaining Agreement made and entered into on July 1, 2007, at Orlando, Orange County, Florida, of the International Association of Bridge, Structural, Ornamental, and Reinforcing Iron Workers and the Mid Florida Steel Erectors Association, Inc.

By the execution of this undertaking, the undersigned expressly acknowledges that he has received and examined a true and exact copy of the aforementioned Collective Bargaining Agreement. In addition, the undersigned Employer adopts and accepts as his representatives in the administration of the aforementioned Healthcare , Pension, Annuity, Substance Abuse, and Apprenticeship Funds those trustees appointed by MFSEAI who are acting as employer trustees and Administered.

The aforementioned Collective Bargaining Agreement, as a amended, shall be in full force and effect until June 30, 2011. and **Extended thru June 30, 2012**

Accepted for Company:

______________________
( Print Name)

______________________
(Authorized Signature of Employer)

______________________
Local Address

______________________
Local Phone Number and Fax Number

Worker's Comp. Insurance Carrier:

______________________

______________________

______________________

Accepted for Local 808:

______________________
Henry W. Kendrick, Business Mgr.

______________________
Date

**General Working Rules:**

**Heath and Safety, Section 30**

Insert a new Section to be know as Section 30, Health and Safety, Paragraphs a and b to read as follows:

**Health and Safety, Section 30**

"**Sec. 30 a.** In accordance with the requirements of the Occupational Safety and Health Act of 1970, it shall be the sole responsibility of the Employer to insure the safety and health of its employees. Nothing in this Agreement will make the Union liable to any employees or to any other persons in the event that injury or accident occurs.

**Sec.30b.** The safety and health standards and rules contained herein are minimum standards and are not intended to imply that the Union objects to the establishment and imposition by the Employer of additional or more stringent rules to protect the health and safety of the employees. It shall be the sole responsibility of the Employer to insure compliance with safety and health standards and rules."

Copies: Employer
Union

Mid Florida Steel Erectors
Association, Inc.

**EGAN, LEV & SIWICA, P.A.**
ATTORNEYS AND COUNSELORS AT LAW

JOSEPH EGAN, JR.
TOBE M. LEV
RICHARD P. SIWICA

POST OFFICE BOX 2231
ORLANDO, FLORIDA 32802-2231
TEL (407) 422-1400
FAX (407) 422-3658

STREET ADDRESS
231 E. COLONIAL DRIVE
ORLANDO, FLORIDA
32801

August 2, 2012

**VIA U.S. MAIL**

Mr. Ellison Marsil
Champion Steel Corporation
Post Office Box 3478
DeLand, Florida 32721-3478

***Re: Champion Steel***
***Our File No. 00354-00400***

Dear Mr. Marsil:

Please be advised that the Trustees have elected to conduct a payroll audit of your books and records for the past two years.

Please advise when your books and records can be made available for inspection by our auditor, Steven Eisenberg.

Sincerely,

Tobe Lev

cc: Steven Eisenberg

EXHIBIT
C

**EGAN, LEV & SIWICA, P.A.**
ATTORNEYS AND COUNSELORS AT LAW

JOSEPH EGAN, JR.
TOBE M. LEV
RICHARD P. SIWICA

POST OFFICE BOX 2231
ORLANDO, FLORIDA 32802-2231
TEL (407) 422-1400
FAX (407) 422-3658

STREET ADDRESS
231 E. COLONIAL DRIVE
ORLANDO, FLORIDA
32801

August 17, 2012

**VIA U.S. MAIL**

Ellison Marsil
Champion Steel Corporation
Post Office Box 3478
Deland, Florida 32721-3478

**Re:** ***Champion Steel (Payroll Audit)***
***Our File No. 00354-00400***

Dear Mr. Marsil:

The following responds to your letter of August 9, 2012 wherein you ask for a "fully executed copy of the agreements between Champion Steel of Central Florida and IW Local 808.

I am enclosing a copy of the last collective bargaining agreement, which had effective dates from 2007 to 2010. That collective bargaining agreement has continued in effect until the present pursuant to the provisions in Article 20 - Duration.

I am also enclosing a copy of an acknowledgment that you signed in August 2005. Article 1.1.2. of the collective bargaining agreement establishes a procedure by which an employer may provide notice that it will no longer be bound by the CBA. Champion has never provided such a notice. Thus Champion remains bound.

Also, every time that Champion sends in a reporting form it signs a statement that "...the undersigned employer, by signing this form, acknowledges that he is bound to all and any provisions of the current collective bargaining agreement in existence." Champion has sent in many such forms including several within the last twelve months.

Champion has also manifested an intent to be bound by the agreement by continuously using labor from the union's hiring hall and paying that labor at the contractual rates.

EXHIBIT
D
tabbies

Article 14.14.13 of the collective bargaining agreement provides that "Each employer shall promptly furnish for inspection to the trustees or their designee, on demand, all payroll records relating to all Employees....." Article 14.14.14 provides that each employer "shall promptly furnish to the trustees on demand the names of its employees, social security numbers, the hours worked by each Employee, and such other information as the trustees reasonably require in connection with the administration of the Trust Fund and for no other purpose. The trustees may by their representatives, examine the pertinent employment and payroll records of each Employer at the Employer's place of business whenever such examination is deemed necessary or advisable by the trustees in connection with the proper administration of the Trust Fund."

Champion has refused to provide monthly reports to the Trust Funds although it has continued to use labor supplied by the hiring hall. Champion has also failed to make remittances to the Trust Funds for many months. Accordingly, the Trustees need an audit. Please advise when the audit may commence.

Sincerely,

Tobe Lev

Enclosure

cc: Ironworkers Local 808